# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
### NO. _____

| | |
|---|---|
| **QUINCY NOVAK,** individually and as parent and guardian of **R.N.** <br> **LEE ANN NOVAK**, individually and as parent and guardian of R.N., and <br> **R.N.**, a minor by and through her parents and guardians Quincy and Lee Ann Novak, <br><br> PLAINTIFFS, <br><br> vs. <br><br> **UNITED STATES OF AMERICA.** <br><br> DEFENDANT. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |

NOW COMES Plaintiffs, by and through the undersigned counsel, complaining of the Defendant as follows:

## PRELIMINARY STATEMENT

1. This action arises under the Federal Tort Claims Act ("FTCA", 28 U.S.C. §§ 2671-80), based on the negligence of one or more agents, employees, and contractors of the Womack Army Medical Center in Fayetteville, North Carolina, who were deemed to be employees of the United States of America, and whose acts or omissions caused injury and damages to Plaintiffs. The negligence of each such person caused injury and damages to Plaintiffs such that, were the United States a private person, it would be liable to plaintiff under the laws of North Carolina.

2. This action is filed separate from, and is not intended to have any effect on, the outcome of any other administrative claim, or litigation of a claim, on behalf of the Plaintiffs under the Federal Tort Claims Act.

**PARTIES AND JURISDICTION**

3. Jurisdiction for this action under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-80, is based on 28 U.S.C. §1346(b).

4. Minor Plaintiff R.N. is a resident of Milwaukee County, Wisconsin. She is a minor, born on May 12, 2019, and brings this action through her parents and guardians, Plaintiff's Lee Ann and Quincy Novak.

5. Plaintiff Lee Ann Novak is an adult citizen and resident of Milwaukee County Wisconsin. She is the mother and natural guardian of Minor Plaintiff R.N. and is under no legal disability.

6. Plaintiff Quincy Novak is a resident of Milwaukee County, Wisconsin. He is currently and at all times relevant herein has been an active duty servicemember in the United States Army. He is the father and natural guardian of Minor Plaintiff R.N. and is under no legal disability.

7. Because Mr. Novak has continuously remained in active duty as a servicemember at all times during the facts alleged herein and continuing through to the present day, Plaintiff's in this action are entitled to all the protections available under the Federal Servicemembers Civil Relief Act ("SCRA"), 50 U.S.C. § 3901 *et. seq.*, and the North Carolina Servicemembers Civil Relief Act, N.C. Gen. Stat. § 127B-25 *et. seq*.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8. Pursuant to 28 U.S.C. § 2675(a), the claims set forth herein were presented to the United States Department of the Army, the Office of the Medical Center Judge Advocate, and Womack Army Medical Center. This civil action was timely commenced on May 11, 2021, by submitting a completed SF-95, including an attachment describing the claims herein in great detail, to the appropriate representatives. More than six (6) months have passed without the agencies making a final disposition of the claim. As such, pursuant to 28 U.S.C. § 2675(a) Plaintiffs have elected to deem the claim finally denied and proceed with this action.

9. At all times relevant hereto, the healthcare providers and others who were involved in the provision of care and treatment to Minor Plaintiff were, on information and belief, deemed to be the lawful employees of the Defendant, the United States of America, for purposes of the Federal Tort Claims Act. 28 U.S. Code § 2671 *et. seq.* (FTCA). During all times mentioned in this complaint, these persons were acting within the lawful scope and course of this employment.

## STATEMENT OF THE FACTS

10. In 2018-19, Plaintiff Lee Ann Novak, a healthy 26-year-old woman, was pregnant with her first child. Lee Ann's received her obstetric care from Womack Army Medical Center ("WAMC"), as her husband and father of the child, Plaintiff Quincy Novak, was an active duty servicemember in the United States Army, stationed at Fort Bragg. Plaintiff Quincy Novak remains an active duty servicemember in the United States Army to this day.

11. Lee Ann's prenatal records document a normal and uncomplicated pregnancy, with no significant concerns for her or her fetus prior to labor. At 39 weeks gestation, Lee Ann was admitted to the labor and delivery department of WAMC after a spontaneous rupture of her membranes.

12. On May 12, 2019, Mrs. Novak gave birth to her daughter, Minor Plaintiff R.N., at WAMC, Fort Bragg. R.N. was born vaginally, and the delivery was without complication.

13. Immediately following her birth, R.N. weighed a healthy 8.13 pounds and had Apgar scores of 8-9. No risk factors or identifiers for potential fetal or newborn infection were present.

14. Following delivery, R.N. and Lee Ann were admitted to the well-baby nursery for routine newborn care and surveillance. At this time, R.N.'s state of wellness remained normal and healthy. She continued to exhibit no risk factors or identifiers for potential infection.

15. Given the positive indications of her health and her unremarkable medical course, R.N. and Lee Ann met the criteria for safe discharge and were so discharged at 48 hours with instructions to follow up as an outpatient in 2 days, pursuant to the normal protocol at WAMC. At this time, R.N. was a fully healthy child who had not suffered any of the damages alleged later in this Complaint.

16. On May 16th, Lee Ann presented as scheduled to WAMC at 8:00 am and reported that she had been having great difficulty breastfeeding R.N. that morning and the preceding night. Specifically, Lee Ann reported that R.N. had been

attempting to feed every 3 hours for approximately 5-10 minutes each feed, but that she had only been taking a very small amount of breast milk each time. Providers at WAMC took R.N.'s vital signs and found that her weight was down 5.6% from the time of her birth.

17. Given these concerns, Lee Ann and R.N. were referred to a lactation consultant with WAMC, Dietra Dalton. Ms. Dalton found R.N. to be lethargic and difficult to wake. Ms. Dalton made several attempts to wake baby R.N. to get her to feed, but was only able to get her to take 10mls of breast milk in 25 minutes despite her massaging Lee Ann's breasts and switching breasts three times. After 40 minutes of work, Ms. Dalton was only able to transfer a total of 32mls of breastmilk to baby R.N.

18. The standard of care required a provider in Ms. Dalton's same or similar circumstance, along with the pediatric physician, physicians assistants, and/or nursing providers of Defendant who worked with and/or supervised Ms. Dalton, to know that a healthy 4-day-old newborn, born at term gestation, and of average weight will generally take 30-60mls of breastmilk every 2-3 hours, with 60-80% of the breastmilk being transferred to the baby in the first 5-10 minutes of breastfeeding.

19. The standard of care required a provider in Ms. Dalton's same or similar circumstance, along with the pediatric physician, physicians assistants, and/or nursing providers of Defendant who worked with and/or supervised Ms. Dalton, to be concerned about potential infection, sepsis, or other ailments, upon encountering a baby such as R.N., who had been feeding readily for 4 days, before suddenly becoming

too lethargic to wake for feedings and requiring extensive coaxing just to take in 31mls of breastmilk in 40 minutes.

20. The standard of care required a provider in Ms. Dalton's same or similar circumstance, along with the pediatric physician, physicians assistants, and/or nursing providers of Defendant who worked with and/or supervised Ms. Dalton, to thoroughly investigate and/or cause a patient with symptoms and signs like R.N.'s to be thoroughly investigated to diagnose and/or rule out potential infection or sepsis.

21. Defendant's providers should have known that failure to timely and properly investigate, test for, diagnose, or treat potential infection or sepsis in R.N. could foreseeably result in the spread or growth of a bacterial infection in R.N.'s body and vital organs, with the potential of causing irreversible damage to her brain or the other areas of her body. Likewise, Defendants' providers knew or should have known that timely and proper diagnosis and treatment of R.N. would, more likely than not, prevent any serious or permanent harm to her from a bacterial infection.

22. The standard of care required providers such as Ms. Dalton along with the pediatric physician, physicians' assistants, and/or nursing providers of Defendant who worked with and/or supervised Ms. Dalton to thoroughly investigate and/or cause a patient with symptoms and signs like R.N.'s to be timely and properly investigated to diagnose, test for, treat, and/or rule out potential bacterial infection or sepsis.

23. Despite this, Lee Ann and R.N. were discharged home with no investigation, testing, or treatment for potential infection, and instead only

instructed Lee Ann to limit each feeding to 30-40 minutes and if needed, supplement with expressed breast milk ("EBM") and return for evaluation the following day, in violation of the applicable standard of care.

24. Upon returning home, R.N.'s feeding situation did not improve, as Lee Ann continued to have extreme difficulty getting her to take sufficient breastmilk. Given these concerns, Lee Ann again brought R.N. to WAMC on May 17, to seek treatment and help.

25. On admission, WAMC providers Ann Schilling and April Henderson found that R.N.'s weight was now down 7.2% from birth. Lee Ann reported she was trying to feed R.N. every 3-4 hours with the use of a nipple shield and for one longer 5-hour stretch overnight, and shared her concerns about 5-day-old R.N.'s continued weight loss. R.N.'s physical exam at this time was again noted as normal, including normal neurological exam, with the exception of facial jaundice. Had Defendant's providers followed the standard of care to timely and properly treat potential bacterial infection at this time, R.N. would have avoided the injuries and damages complained of herein.

26. The standard of care required a medical provider in either Ms. Schilling or Henderson's same or similar position, along with the pediatric physician, physicians assistants, and/or nursing providers of Defendant who worked with and/or supervised them, to recognize R.N.'s condition, particularly her weight loss, as cause for concern of potential infection or sepsis and act to diagnose or rule out the same.

27. The standard of care required a medical provider in either Ms. Schilling or Henderson's same or similar position, along with the pediatric physician, physicians assistants, and/or nursing providers of Defendant who worked with and/or supervised them, to thoroughly investigate and/or cause a patient with symptoms and signs like R.N.'s to be thoroughly investigated to diagnose and/or rule out potential infection or sepsis.

28. Neither Ms. Schilling nor Ms. Henderson, nor any other WAMC provider did so in violation of the standard of care.

29. The standard of care required a medical provider in either Ms. Schilling or Henderson's same or similar position, along with the pediatric physician, physicians assistants, and/or nursing providers of Defendant who worked with and/or supervised them, to attempt to observe new mother Lee Ann feeding R.N. to verify her sense of the quality of R.N.'s feedings and ensure that she was capable of transferring, either by breastfeeding or alternative methods, enough milk to support R.N.'s continued hydration and weight gain.

30. Neither Ms. Schilling, nor Ms. Henderson, nor any other WAMC provider did so, in violation of the standard of care.

31. Rather, the visit ended and Lee Ann and R.N. were discharged with no investigation, testing for, or treatment of potential infection occurring and instead left only with recommendations for Lee Ann to continue using the nipple shield and supplement with R.N.'s feedings with EBM or formula as tolerated by baby R.N. and to return for a follow up in 48-72 hours.

32. Lee Ann and R.N. next presented to WAMC on May 20, with R.N.'s feeding and weight loss issues largely unimproved. The two were seen by WAMC providers Cierra Roach, M.D., and Shelly Bagwell. R.N. was now 8 days old and had gained only 10 grams of weight since her last visit, representing a 6.9% decrease from her birthweight.

33. The standard of care required a medical provider in either Dr. Roach or Nurse Bagwell's same or similar position, along with the pediatric physician, physicians assistants, and/or nursing providers of Defendant who worked with and/or supervised them, to know that, at 8 days of age, a healthy baby should be gaining 30-40 grams per day and should weigh close to or more than their birth weight. Reasonable and properly trained providers of the kind would recognize that a baby with R.N.'s symptoms was exhibiting increasingly more clear and concerning signs of potential infection or sepsis.

34. The standard of care required a medical provider in either Dr. Roach or Nurse Bagwell's same or similar position, along with the pediatric physician, physicians assistants, and/or nursing providers of Defendant who worked with and/or supervised them, to recognize R.N.'s condition, particularly her weight, as cause for concern of potential infection or sepsis and to act to timely and properly diagnose, rule out, or treat the same.

35. The standard of care required a medical provider in either Dr. Roach or Nurse Bagwell's same or similar position, along with the pediatric physician, physicians assistants, and/or nursing providers of Defendant who worked with and/or

supervised them, to thoroughly investigate and/or cause a patient with symptoms and signs like R.N.'s to be thoroughly investigated to diagnose and/or rule out potential infection or sepsis.

36. Neither Ms. Roach, nor Ms. Bagwell, nor any provider at WAMC did so, in violation of the standard of care.

37. Rather, the visit concluded with no investigation, testing for, or treatment of potential infection occurring, and instead ended only with the WAMC providers discussing a non-specific feeding schedule with Lee Ann and recommending that she be seen the following day by a lactation consultant, in violation of the standard of care.

38. The Novaks followed up for R.N. at WAMC again on May 22 and were again seen by Ms. Dalton, the lactation consultant.

39. At this visit, Ms. Dalton failed to document R.N.'s vital signs or weight, in violation of the standard of care.

40. The standard of care in place at WAMC on May 22, required Nurse Dalton to document the weight and vitals of a patient like R.N. The same was especially important, given the concerns for potential infection and the reason for the visit was continued poor feeding and continued inadequate weight gain.

41. At the visit, Lee Ann reported 8-12 attempts at feeding per day. Nurse Dalton then observed Lee Ann attempting to feed R.N. and determined R.N. to have received 86mls of breastmilk. After her observation, Nurse Dalton encouraged Lee

Ann to increase her feedings of R.N., but also advised Lee Ann that she did not need to follow-up further regarding these concerns.

42. The standard of care required a provider in Nurse Dalton's same or similar circumstance, along with the pediatric physician, physicians assistants, and/or nursing providers of Defendant who worked with and/or supervised Nurse Dalton, to know that 8-12 feedings per day is the expected frequency for a 10-day-old baby like R.N. Such a provider would know that increasing feedings beyond this point should not be necessary for a healthy baby.

43. The standard of care required a provider in Nurse Dalton's same or similar circumstance, along with the pediatric physician, physicians assistants, and/or nursing providers of Defendant who worked with and/or supervised Nurse Dalton, to recognize R.N.'s condition, particularly her weight, as cause for concern of potential infection or sepsis and would act to diagnose or rule out the same.

44. The standard of care required a provider in Nurse Dalton's same or similar circumstance, along with the pediatric physician, physicians assistants, and/or nursing providers of Defendant who worked with and/or supervised Nurse Dalton, to thoroughly investigate and/or cause a patient with symptoms and signs like R.N.'s to be thoroughly investigated to diagnose and/or rule out potential infection or sepsis.

45. Neither Ms. Dalton, nor any provider at WAMC did so, in violation of the standard of care.

46. On May 24, R.N.'s feeding intake again decreased, forcing Lee Ann to resort to attempt feeding her breast milk by syringe. That night, Lee Ann felt R.N.'s body begin suddenly and abnormally shaking while holding her. Lee Ann then watched in horror as R.N.'s eyes crossed, back stiffened, and lips puckered. Seeing this, the Novaks were gravely concerned that R.N. was having seizures and rushed R.N. to the emergency room at WAMC.

47. On admission to the ER, WAMC providers found that R.N.'s weight still remained significantly lower than it had been at birth and noted that she was febrile with a temperature of 100.3 degrees Fahrenheit.

48. At the WAMC ER, R.N. continued to experience seizure like symptoms with nurses documenting an episode of R.N.'s back arching and eyes crossing. WAMC nurses further noted that R.N. did not startle to loud noise during the episode, but moved her extremities and was not rigid when picked up.

49. These concerning signs prompted the WAMC providers to order a complete infection/septic work-up of R.N., including CBC, blood culture and lumbar puncture to testing for meningitis. Additionally, medical imaging of R.N.'s head was taken which showed extensive and concerning subdural fluid collection.

50. Given her symptoms, the ER providers at WAMC were concerned that R.N. may need to undergo neurosurgery to save her life. As such, R.N. was transferred to UNC Hospital to provide for this possibility.

51. Predictably given the warning signs present at each of R.N.'s previous presentations to Defendant's providers described herein, testing of R.N.'s blood and

cerebrospinal fluid cultures were positive for E. Coli bacteria. Further investigation at UNC determined that R.N.'s E. Coli infection had by that time become extensive and included sepsis, meningoencephalitis and a large intracranial empyema which was so severe that R.N. required neurosurgical drainage.

52. This infection was so severe that R.N. required 6 weeks of parenteral antibiotics and intense seizure management.

53. On May 28, UNC neurosurgeons emergently performed a left convexity burr hole evacuation of subdural empyema and bilateral parietal/occipital evacuation of subdural empyema. This procedure involved lacerating and drilling a hole into the side of baby R.N.'s head in order to drain the infected fluid from her head and relive pressure on her brain.

54. Tragically, the negligence of Defendant's providers as described herein directly and proximately caused R.N. to suffer severe and permanent injuries to her brain, including but not limited to extensive global neurodevelopmental deficits and chronic seizure disorder likely to be permanent and preclude her living a normal and independent life.

55. Defendant's providers knew or should have known that E. Coli is the second most common bacteria to cause infection in the newborn period and is easily treatable without residual complications if diagnosed during the bacteremic stage (infection in the blood only), before the bacteria has time to seed and cause harm to critical organs such as the brain.

56. In other words, R.N.'s infection is one which could and would have been readily treated and eradicated from the her body, thus preventing any damages to R.N., had her providers at WAMC timely observed, diagnosed and treated it, as required by the applicable standard of care.

57. Because of the failure of WAMC providers to comply with the standard of care to timely observe, diagnose, and treat R.N.'s infection, she was not afforded this opportunity and instead directly and proximately suffered harms and damages as alleged herein.

58. R.N. remained in the continuing care and treatment of Defendant at WAMC for injuries caused by the negligence Defendant until late 2021 when Mr. Novak was transferred to Fort Hood, Texas, causing the Novak family to relocate.

59. To this day, R.N. remains in the continuing care and treatment of Defendant for injuries caused by the negligence of Defendant.

60. As a direct and proximate result of Defendant's negligent acts and omissions as described herein, Minor Plaintiff R.N. has suffered, and will suffer in the future, damages including but not limited to physical pain, emotional suffering, permanent injury and disabilities, future medical and other expenses, as well as other damages to be proven at trial.

61. As a direct and proximate result of Defendants' negligent acts and omissions as described herein, Plaintiff Lee Ann Novak has suffered damages in the forms of past and future medical expenses behalf of Minor Plaintiff R.N. until R.N.

reaches the age of majority, as well severe emotional suffering and distress, as well as other damages to be proven at trial.

62. As a direct and proximate result of Defendants' negligent acts and omissions as described herein, Plaintiff Quincy Novak has suffered damages in the forms of past and future medical expenses behalf of Minor Plaintiff R.N. until R.N. reaches the age of majority, as well severe emotional suffering and distress, as well as other damages to be proven at trial.

## FIRST CLAIM FOR RELIEF
### *Negligence of Defendant*

63. Plaintiffs adopt and incorporate herein by reference all previous allegations of this Complaint.

64. At all times relevant hereto, a health care provider-patient relationship existed by and between Defendant (by and through its providers and agents at WAMC) and Plaintiffs. Each member WAMC provider who treated R.N. was acting as "health care providers" within the definition and meaning contained in N.C. Gen. Stat. § 90-21.11. As such, the members of the WAMC providers who treated R.N. each owed a duty to use their best judgment in the care and treatment of R.N.; to exercise reasonable care and diligence in the application of their knowledge and skill to the care of R.N.; and to provide R.N. with health care services in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities under the same or similar circumstances at the time the health care is rendered.

65. Each and every WAMC provider who participated in the treatment of R.N. was acting at all times relevant to this action as an agent/employee of the Defendant, and was acting within the course and scope of their agency/employment.

66. Accordingly, the Defendant and its agents/employees were negligent in the care and treatment of R.N. in that they:

a. Failed to timely or properly test, diagnose, and treat R.N.'s infection despite the presence of multiple warning signs over the course of several days;

b. Failed to properly develop, consider, investigate, diagnose or rule out, causes or explanations for R.N.'s sudden lack of interest in feeding and/or inadequate wight during or after R.N.'s visit of May 16, 2019;

c. Failed to properly investigate and workup the cause of continued poor feeding and associated additional weight loss during or after her clinic visit of May 17, 2019;

d. Failed to consult with pediatrician physician in a timely or proper manner on May 17, 2019, regarding R.N.'s persistent issues with poor feeding and abnormal weight;

e. Failed to properly develop, consider, investigate, diagnose or rule out, causes or explanations for poor weight gain noted on May 20, 2019;

f. Failed to weigh R.N. during the visit of May 22, 2019 despite poor weight gain being the reason for the visit;

g. Failed to have in place, implement, and/or adhere to any proper policy, procedure and/or protocol regarding the proper and timely diagnosis and treatment of newborns with signs of potential infection;

h. Failed to use reasonable care and diligence in the application of their knowledge and skill during their care of R.N. Novak;

i. Failed to use their best judgment in their care and treatment of R.N.;

j. Failed to possess or exercise that degree of professional learning, skill and ability ordinarily exercised or possessed by the average health care provider, with the same or similar training and experience practicing in the same or similar community under the same or similar circumstances at the time the health care was rendered as required by N.C. Gen. Stat. § 90-21.12;

k. Failed to satisfy their duties as a health care provider for R.N. Novak as set forth in N.C.P.I Civil 809.05A;

l. The actions or inactions of Defendant were not in accordance with the standards of practice among similar health care providers situated in the same or similar communities under

the same or similar circumstances at the time of the alleged acts giving rise to Plaintiffs' causes of action as described herein;

m. Failed to properly monitor or supervise the practices of the providers, employees, and agents involved in Plaintiffs' care;

n. Failed to properly train or educate personnel working in the hospital regarding proper communication, follow up, and implementation practices regarding the diagnosis and treatment of bacterial infections of newborns;

o. Failed to develop, adopt, maintain, implement, provide training for, follow, and enforce an adequate set of policies, procedures, protocols, bylaws, and/or guidelines at WAMC to ensure the proper delivery of medical care to patients, including but not limited to policies and procedures related to the diagnosis and treatment of bacterial infections of newborns;

p. Failed to provide and/or require adequate training, instruction, monitoring, compliance, coordination among providers, and supervision of its employees and contracted medical staff members concerning the diagnosis and treatment of bacterial infections of newborns;

q. Failed to enforce and/or follow its written protocols, standing orders, guidelines, procedures and/or policies;

r. In such other ways as may be determined in the course of discovery and/or during the trial of this action.

67. As a direct and proximate result of Defendant's conduct as described herein Plaintiffs Lee Ann and Quincy Novak have suffered damages in the form of past and future medical expenses on behalf of Minor Plaintiff R.N. until she reaches the age of majority.

68. As a direct and proximate result of Defendants' conduct as described herein, Minor Plaintiff R.N. has suffered damages and injuries such as permanent brain damage, disfigurement, pain, suffering, embarrassment, loss of enjoyment of life, medical expenses, and other harms such that they are entitled to recover damages.

## COMPLIANCE WITH NORTH CAOROLINA PROCEDURAL REQUIREMENTS AND VARIOUS CONSTITUTIONAL OBJECTIONS

69. Plaintiffs adopt and incorporate herein by reference all previous allegations of this Complaint.

### North Carolina Rule of Civil Procedure 9(j)

70. Plaintiffs object to the pre-filing requirements of Rule 9(j) of the North Carolina Rules of Civil Procedure. Rule 9(j) effectively requires plaintiffs to prove their case before factual discovery is even begun, denies medical malpractice plaintiffs their rights of due process of law and equal protection under the law, the right to open courts, and the right to a jury trial, violates the separation of powers, and confers an exclusive emolument on health care providers, in violation of the United States and North Carolina constitutions. Rule 9(j) violates the Seventh and

Fourteenth Amendments of the United States Constitution, and Article I, sections 6, 18, 19, 25 and 32 and Article IV, sections 1 and 13 of the North Carolina Constitution.

71. Without waiving these objections, counsel for Plaintiffs provide the following information to comply with the requirements of Rule 9(j): the medical care and all medical records pertaining to the alleged negligence that are available to the Plaintiffs after reasonable inquiry have been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care.

72. If the Court later determines that Plaintiffs' 9(j) expert does not meet the requirements of Rule 702(b), or some other prong of Rule 702, Plaintiffs will seek to have that person qualified as an expert witness by motion under Rule 702(e) of the North Carolina Rules of Evidence, or other applicable federal rules, and Plaintiffs hereby move the Court, pursuant to North Carolina Rule 9(j)(2), to so qualify that person.

### North Carolina Cap on Non-Economic Damages

73. Plaintiffs object to N.C.G.S. § 90-21.19 ("the cap on noneconomic damages") as unconstitutional. The cap on noneconomic damages denies medical malpractice plaintiffs, including Plaintiffs in this action, the right to a jury trial, due process of law, equal protection under the law, and the right to open courts, violates the separation of powers, and confers an exclusive emolument on health care providers, in violation of the United States and North Carolina constitutions. The cap

on noneconomic damages violates the Seventh and Fourteenth Amendments of the United States Constitution and Article I, sections 6, 18, 19, 25 and 32 and Article IV, sections 1 and 13 of the North Carolina Constitution.

74. To the extent the cap on noneconomic damages is found to be constitutional and applicable to this case, some or all of Defendants' acts or omissions causing Plaintiffs' injuries were committed in reckless disregard of the rights Plaintiffs and others and/or constitute grossly negligent conduct.

75. In the event the Court determines this is a medical malpractice action arising out of the furnishing or failure to furnish professional services in the treatment of an emergency medical condition as the term "emergency medical condition" is defined in 42 U.S.C. § 1395(b)(d)(e)(1)(A), the evidence of negligence causing Plaintiffs' injuries is clear and convincing.

**North Carolina Rule of Evidence 414**

76. Plaintiffs alleged that N.C. Rule of Evidence 414 is a procedural rule of state law which only applies in state court and has no application to this matter in federal court. To the extent the enactment of N.C. Rule of Evidence 414 in 2011 is argued or deemed to represent a change to North Carolina's substantive law of damages, then Plaintiffs object to Sections 1.1 and 1.2 of Session Law 2011-283 (House Bill 542), the bill that enacted Rule 414 into law, as unconstitutional.

77. These new legislative enactments, which apply to actions arising on or after October 1, 2011, violate Article IV, §13(2) of the North Carolina Constitution,

which provides that "No rule of procedure or practice shall abridge substantive rights or abrogate or limit the right of trial by jury."

78. Sections 1.1 and 1.2 of House Bill 542 also violate the right to a jury trial, due process of law, equal protection under the law, and the right to open courts, and violate the separation of powers, in violation of Article I, sections 6, 18, 19, and 25, and Article IV, sections 1 and 13 of the North Carolina Constitution.

79. Plaintiffs in this action have incurred medical expenses as a result of defendant's wrongful conduct. Under the law, Plaintiffs are entitled to recover their "medical expenses," including "all medical bills reasonably incurred by the plaintiff as a proximate result of the negligence of the defendant." N.C.P.I. Civil 810.04. Contrary to North Carolina substantive law, and in violation of the North Carolina Constitution, Sections 1.1 and 1.2 of House Bill 542 (if found applicable to this federal action, which Plaintiffs contend they are not) bar Plaintiffs from submitting evidence of her medical bills to the jury, and limit plaintiff to presenting "the amounts actually paid to satisfy the bills" and "the amounts actually necessary to satisfy the bills that have been incurred but not yet satisfied." These new evidentiary and procedural rules, if applied in this case, will directly harm Plaintiffs by reducing the amount of medical expenses she can recover for her injuries.

## NATURE OF OBJECTIONS

80. Plaintiffs adopt and incorporate herein by reference all previous allegations of this Complaint.

81. By making the above objections, Plaintiffs are not presently "challenging the validity of a North Carolina statute or provision of the North Carolina Constitution under State or federal law" as contemplated under N.C. Gen. Stat. § 1A-1 Rule 19(d), and Plaintiffs are not seeking in any way in this action for this Court to declare any North Carolina statute to be facially unconstitutional. Instead, Plaintiffs are merely preserving their objections for the record to the extent the same is necessary to preserve a potential future challenge to the validity of the above laws, statutes, or rules.

WHEREFORE, Plaintiffs pray:

1. That the Court enter judgment for Plaintiffs against Defendant in the amounts demanded in the Plaintiffs' original May 11, 2021, administrative Federal Tort Claim complaint filing;

2. That fees, costs, and interest as provided by law be taxed against Defendant;

3. That Plaintiffs be granted a trial by jury on all issues so triable; and

4. That the Court grant such other and further relief as the court deems just and proper.

RESPECTFULLY SUBMITTED, this the 16th day of December, 2025.

**BALLEW PURYEAR PLLC**

Matthew D. Ballew
N.C. State Bar No. 39515
mballew@ballewlaw.com
Trent N. Turk
N.C. State Bar No. 62718
tturk@ballewlaw.com
4000 Westchase Blvd
Suite 300
Raleigh, NC 27607
Telephone: (984) 370-3030
Facsimile: (984) 960-1982
*Attorneys for Plaintiff*